**Justin C.S. KIM, Plaintiff-Appellant,**

v.

**COMMANDANT, DEFENSE LANGUAGE INSTITUTE, FOREIGN LANGUAGE CENTER, an agency of the United States Government, et al., Defendants-Appellees.**

No. 83–2659.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 14, 1985.

Decided Sept. 24, 1985.

Justin C.S. Kim, pro se.

Joseph P. Russoniello, U.S. Atty., Patrick Ramirez S. Bupara, Chief, Civ. Div., Michael J. Tonsing, Asst. U.S. Atty., Stephen L. Schirle, San Francisco, Cal., for defendants-appellees.

Before CHOY, Senior Circuit Judge, TANG and FLETCHER, Circuit Judges.

PER CURIAM.

Justin C.S. Kim, plaintiff-appellant, was passed over for the position of Korean Training Administrator in the Defense Language Institute (DLI), an agency of the United States government. He filed an employment discrimination complaint alleging that he and other non-native English

speakers[1] were discriminated against on the basis of national origin in violation of Title VII of the Civil Rights Act. Kim, whose place of national origin is Korea, objects specifically to the English Language Oral Proficiency Test (ELOPT) and the minimum score required by the DLI to qualify for the Training Administrator position.[2]

All four of the candidates for the Korean Training Administrator position who took the ELOPT were Koreans.[3] Kim was the only candidate not to achieve the required minimum score on the ELOPT. Of the three qualifying Koreans, one was ultimately selected to fill the position.

Without ruling on Kim's request for certification of the class of non-native English speakers in order to bring a class action, the district court granted defendants' motion for summary judgment and dismissed the complaint. Plaintiff appeals.

## ANALYSIS

### I. *Disparate Impact*

■ The district court was correct in concluding that plaintiff failed to make a showing that the ELOPT had a disparate impact upon Koreans. Indeed, plaintiff could not possibly make such a showing since all the applicants for the position of Korean Training Administrator who took the ELOPT were Korean. He thus could not present evidence that a disproportion-

ate number of Koreans applying for that particular job failed the ELOPT.[4]

Similarly, all four persons applying for the Spanish Training Administrator position were Hispanic (a subset of the class of non-native English speakers). In short, the demography of the applicant pools made it impossible for one to demonstrate that the ELOPT had a disparate impact upon non-native English speakers.

Plaintiff, however, attempts to show disparate impact upon non-native English speakers by analyzing the ELOPT scores of applicants for the Korean, Spanish, and German Training Administrator positions *together*. Because the three positions require different skills and have different applicant pools, it is not clear that consideration of the ELOPT scores of all those applicants in combination is proper. *See Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 482 (9th Cir.1983) ("Disparate impact should [generally] be measured against the actual pool of applicants or eligible employees...").

Assuming, *arguendo*, that such an analysis is relevant, the evidence shows that the non-native English speakers had a 50% (4 out of 8) pass rate.[5] While the "four-fifths" rule is implicated because the German pass rate was 100% (50% is less than four-fifths of 100%), *see* 29 C.F.R. § 1607.4 D., the rule is qualified by the statement that such differences "may not constitute adverse impact where the differences are based on small numbers and are not statis-

---

1. Kim, however, excludes native West-Germanic language speakers from this group. The rest of this disposition should be read with that exception in mind.

2. Defendants submitted a declaration that plaintiff was "grandfathered" back into the applicant pool and was considered without regard to his deficient ELOPT score. Plaintiff did not submit any affidavits or other evidence to refute this claim.

 However, plaintiff apparently is challenging not only the specific use of the ELOPT, itself, but the employment of a high English proficiency requirement in general. Plaintiff has standing to make the more general challenge, and because the ELOPT is one measure of English proficiency, he can use ELOPT scores in an

attempt to show that a high English proficiency requirement has a disparate impact.

3. The term "Koreans" is being used here to denote native Korean speakers.

4. It should be noted, however, that the fact that a Korean was ultimately selected for the job does *not* preclude Kim from establishing a prima facie case. *See Connecticut v. Teal*, 457 U.S. 440, 455–56, 102 S.Ct. 2525, 2534–36, 73 L.Ed.2d 130 (1982); *Diaz v. American Tel. & Tel.*, 752 F.2d 1356, 1360–61 (9th Cir.1985).

5. Plaintiff's claim that the pass rate would have been lower had three of the Koreans not had prior knowledge about the test is pure speculation.

tically significant." *Id.* The sample involved in this case (4 Germans and 8 other non-native English speakers) is clearly too small to make the 50%/100% differential adequate proof of adverse impact. *See, e.g., Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 620–21, 94 S.Ct. 1323, 1333–34, 39 L.Ed.2d 630 (1974).

The additional evidence that plaintiff sought to introduce (see appellant's brief at 32–33) concerns only the issue of whether the proficiency test requirement bears a "manifest relationship to the employment in question." *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). None of the proffered material directly supports the claim that the tests have a discriminatory impact.

■ The employer's burden of showing the "manifest relationship" arises "only after the complaining party or class has made out a prima facie case of discrimination, *i.e.,* has shown that the tests in question select applicants for hire or promotion in a ... pattern significantly different from that of the pool of applicants." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). Thus, because plaintiff's proffered evidence could not help establish the required prima facie case of disparate impact, it could not defeat the summary judgment motion.[6]

Contrary to plaintiff's assertion, defendants never admitted that the ELOPT had a disparate impact. The district judge properly granted the motion for summary judgment.

## II. *Propriety of Deciding Merits Prior to Class Certification*

■ Before the class action certification issue could be reached, the merits of plaintiff's claim were disposed of via summary judgment.[7] Plaintiff argues that it was improper for the district court to decide the merits of the case prior to a ruling on class certification.

We have specifically rejected this contention stating that "[w]here the defendant assumes the risk that summary judgment in his favor will have only stare decisis effect on the members of the putative class, it is within the discretion of the district court to rule on the summary judgment motion first." *Wright v. Schock,* 742 F.2d 541, 544 (9th Cir.1984). The district court acted within its discretion because, as in the *Wright* case, "early resolution of [the] motion for summary judgment seem[ed] likely to protect both the parties and the court from needless and costly further litigation." *Id.*

## III. *Allegations of Defendants' Untimely Filings*

■ Defendants' answer was filed and mailed to plaintiff 61 days after service of the complaint upon the United States Attorney. Because the 60th day was a Sunday, defendants were allowed an additional day, Fed.R.Civ.P. 6(a), and thus the answer was timely filed within the 60-day period prescribed by Fed.R.Civ.P. 12(a). Because "[s]ervice by mail is complete upon mailing," Fed.R.Civ.P. 5(b), it is irrelevant that plaintiff did not *receive* the answer until the following day.

■ While defendants filed their reply to plaintiff's opposition to defendants' motion for summary judgment (and declaration in support of the reply) a day late under local district court rules, the district court's grant of summary judgment need not rely upon either of those two documents and can rest upon defendants' original memorandum in support of its motion for summary judgment. Moreover, we conclude that the district court's grant of summary judgment was proper as a matter of law.

---

**6.** It is therefore unnecessary to address plaintiff's charge that the district court improperly denied him the chance to present his additional evidence at the summary judgment hearing.

**7.** Defendant's admission that there were facts relating to the *certification* issue requiring investigation did not amount to an admission that there were genuine issues of material fact regarding the *merits* of plaintiff's claim.

We do not and need not resort to those two disputed documents to find that plaintiff failed to create a genuine issue of fact as to disparate impact.

AFFIRMED.